IN THE MATTER OF THE ESTATE OF BYRON CON-
NELLY, Deceased. VIVIAN CONNELLY, Proponent and
Appellant, *v.* LORRAINE CONNELLY, Contestant and
Respondent.

No. 9992.
Submitted March 1, 1960. Decided September 14, 1960.
355 P.2d 145.

Jerrold R. Richards, Helena, J. Chan Ettien, Havre, for appellant. Jerrold R. Richards argued orally.

Jess L. Angstman, Havre, argued orally, for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an appeal from an order of the district court of the twelfth judicial district denying probate to an instrument propounded as the last will and testament of Byron Connelly. Byron Connelly, the deceased, will hereinafter be referred to as the testator. Vivian Connelly, sister of the testator, was proponent and Lorraine Connelly, wife of the testator, was contestant of the purported will in the proceedings to determine if the instrument was entitled to probate. The matter was heard before the district court without a jury and the court found that the instrument was not entitled to probate since it "was not executed and attested in the manner required by law."

The sole issue in this case is whether the order of the district court was correct, and this involves a consideration of the evidence and law in relation to the requirements for the proper execution of a will.

The instrument was signed by the testator and by two subscribing witnesses, Frank May and Ray Kuka. There was an attestation clause which was worded as follows: "The foregoing instrument, consisting of two pages including the page signed by the testator, was at the day and year hereof, by the said Byron Connelly, signed, sealed, published and declared to be his last will and testament in the presence of us, who, at his request, and in his presence, and in the presence of each other, have signed the same as witness thereto." There was also

substantial, uncontroverted evidence to prove that all three signatures were genuine.

It appeared from the sheriff's return that the subscribing witness, Ray Kuka, was outside of Hill County at the time of the hearing and his testimony was not given at the hearing. The only witness who testified as to the facts surrounding the execution of the instrument was the subscribing witness, Frank May, who was called as a witness by the proponent of the instrument. Upon direct examination the testimony of Frank May, concerning the circumstances that surrounded the execution of the will was given as follows:

"Q. I am showing you the purported will of Byron Connelly, deceased, which was filed in this Court on April 23, 1958. I will ask you if you recognize the signature of Byron Connelly? A. Yes.

"Q. That's Byron Connelly's signature on that instrument? A. Yes. It isn't exactly like his signature. The last name doesn't look like it, but it is his signature. I can tell that.

"Q. The signature, Frank E. May, is yours? A. Yes.

"Q. And Ray E. Kuka is the other witness? A. Yes.

"Q. And do you recall signing this will for Mr. Connelly? A. No, I don't. Not especially. I know it's my signature.

"Q. At that time, did Mr. Connelly request you to witness this instrument? A. He must have. Yes, he did.

"Q. And at that time, was Mr. Kuka there? A. I wouldn't know for sure.

"Q. But you do know that you and Ray Kuka witnessed this will? A. I know that I did. * * *

"Q. At the time that Mr. Connelly signed this will, did he request you to witness his signature to his will? A. I don't remember whether Mr. Connelly signed it when I was there or not.

"Q. Was his signature on it at the time you signed it? A. I don't remember.

"Q. I will read this attestation clause to you: 'The fore-

going instrument, consisting of two pages including the page signed by the testator, was at the day and year hereof, by the said Byron Connelly, signed, sealed, published and declared to be his last will and testament in the presence of us, who, at his request, and in his presence, and in the presence of each other, have signed the same as witness thereto.' Do you understand that attestation clause? A. Yes.

"Q. And you have signed your signature under that attestation clause? A. Yes.

"Q. And those are the facts at the time you signed, to the best of your recollection, is that correct? A. I suppose, yes. * * *

"Q. At the time that Mr. Connelly executed this will, is it your opinion that he wasn't acting under duress, fraud, or undue influence, is that correct? A. Well, yes, he knew what he was doing.

"Q. It was his own act and deed when he signed the will? He volunteered that this was his own will? A. Yes.

"Q. And not the will of anyone else? A. No."

On cross-examination this subscribing witness testified as follows:

"Q. Now getting back to this will, did you see Byron Connelly sign the will? A. Gosh, I don't remember. I wouldn't swear that I did or didn't.

"Q. As a matter of fact, Frankie, isn't it a fact that Byron from time to time would push something up to you and would ask you to sign it? A. Yes, on several occasions he signed a will.

"Q. And you don't know whether this is the last one you signed or not, do you? A. No, I wouldn't swear to it that that is the last one.

"Q. As a matter of fact, there's another will that hasn't been signed at all?. A. I have it here in my pocket.

"Q. But that one was never signed? A. No.

"Q. Byron wrote a lot of wills, three or four that you know of, and you probably signed some of them, didn't you? A. I know I signed two or three, maybe more.

"Q. *Did he tell you that this is my last will and testament, and I am asking you to sign it as a witness?* A. *I know of one will I signed.*

"Q. *Could that be this one?* A. *No, not that one.*

"Q. *Did Byron tell you this was his last will and testament before you signed this?* A. *I think the lawyer told me that it was his will.*

"Q. Was Byron there when you signed it? A. I don't know. I can't remember whether he was or not.

"Q. You are pretty sure that Kuka wasn't there, aren't you? A. I don't know.

"Q. And where is Kuka now? A. I think he is on his vacation.

"Q. When did he go, do you know? A. A week ago last Thursday, probably the 3rd of July.

"Q. Did you say that you didn't see Kuka sign this will? A. I don't remember whether I saw him sign it or not.

"Q. In some of the other wills you remember, was the other witness there when you signed it? A. I don't remember that either.

"Q. Do you remember the date of this will? A. No, I don't. I think it's 1956, in February, but the exact date in February I don't recall, but that would be two years ago last February.
* * *

"Q. I don't remember whether I asked you this or not. Did you see Byron sign this document? A. I can't remember.

"Q. You don't know? A. No, I don't." Emphasis supplied.

Upon redirect examination this witness testified:

"Q. Mr. May, I will show you a signature made on the lower right-hand corner of the first page of the will. Do you identify that as Byron Connelly's signature? A. It looks like it.

"Mr. Ettien: That's all. Thank you.

"The Court: Was it there when you signed it? A. I don't know whether it was or not.

"The Court: All right."

From this testimony it can be seen that the subscribing witness, Frank May, was quite uncertain as to what the circumstances surrounding the execution of the instrument actually were.

Throughout the original hearing in this case it appears that the district court was understandably concerned about the testimony of the subscribing witness, Frank May, and wanted to have the testimony of the other subscribing witness, Ray Kuka, concerning the circumstances surrounding the execution of the instrument offered into evidence. This is demonstrated by the following excerpts of the conversation between the court and the attorney for the proponent, Mr. Ettien:

"Mr. Ettien: Please the Court, I have to establish the signature of Mr. Kuka, and I thought Mr. May could do that, and I've asked for someone to come up from the bank—

"The Court: I want Mr. Kuka. Mr. May was certainly very indefinite as to whether they were together when this will was signed. There is enough question about this will that I want to hear from him, Mr. Kuka, what he knows and what he can remember. So you can put in all your evidence today, and we will continue the hearing until such time as he can be here, but put all your other evidence in now.

"Mr. Ettien: We rest at this time. The sheriff's return shows that Mr. Kuka is out of the county.

"The Court: I will take your word for that, but I know he will be available.

"Mr. Ettien: At this time I will object to a continuance, it being shown that Mr. Kuka is outside the county and the statute provides that the testimony of—

"The Court: If you want me to decide on the evidence you've got in here, it's all right with me.

"Mr. Angstman: I think we better have it settled right now, Judge.

"Mr. Ettien: We stand on that, your Honor.

"The Court: All right. Go ahead with your case. * * *

"Mr. Ettien: Your Honor, as to the signature of Ray Kuka, I have got a man—

"The Court: I think it is Mr. Kuka's signature, but there are certain things that have to be proven, and I am willing to let you have time to prove them, but you can't prove them today by someone else.

"Mr. Ettien: Would you be willing to stipulate that that is Ray's signature?

"Mr. Angstman: No. I would like to have the Judge—

"The Court: I have a decision to make, and I am not going off half-cocked on this thing.

"Mr. Ettien: I appreciate that, your Honor, but from the standpoint of the record, I would like to have Mr. Kuka's signature simply identified as his signature, or anyone else that I can get from the bank, if you want to agree to that?

"Mr. Angstman: I don't know whether it is or not.

"The Court: I want to know what happened. These people signed this, but I haven't been able to find out how yet. Maybe Mr. Kuka has a better recollection of what happened than Mr. May.

"Mr. Ettien: If you can go ahead, Mr. Angstman—

"The Court: There are some essential things in connection with this will, whether the witnesses were both there and signed in the presence of each other at the request of the testator, who said it was his will. Now, you haven't proved that so far. I have given you an opportunity to bring Mr. May and Mr. Kuka up here. You are fighting your own proposition, and I am trying to help you.

"Mr. Ettien: We will go ahead and stand on the testimony, and if Mr. Angstman will go ahead and put in his case, then we can establish the signature of Mr. Kuka.

"The Court: He can do that when he gets here himself.

"Mr. Ettien: But I have to do it now, Your Honor.

"The Court: All right. Bring up your witness. I want the entire proof. * * *

"The Court: You want to stand on what you have got in here?

"Mr. Ettien: The proponent will stand on the testimony that has been introduced at this time, and moves that the will be—

"The Court: You don't want the opportunity to produce Mr. Kuka?

"Mr. Ettien: We are satisfied the way it is, your Honor. Would the court like briefs on this?

"The Court: I don't want anything. You haven't proven the will yet.

"Mr. Ettien: We stand on the will.

"The Court: You propose it with the understanding that I gave you the opportunity to produce the other witness?

"Mr. Ettien: The record shows that Mr. Kuka is not in Hill County.

"The Court: The record doesn't show that he can't be produced. I say, I am willing to give you the opportunity to produce the other witness to the will, and you say you don't want it?

"Mr. Ettien: I simply contend we satisfied the requirements of the statute. We stand, your Honor.

"The Court: The admission of the will is denied."

R.C.M. 1947, § 91-107, provides for the execution of a written will as follows:

"Every will, other than a nuncupative will, must be in writing; and every will, other than a holographic will, and a nuncupative will, must be executed and attested as follows:

"1. It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto;

"2. The subscription must be made in the presence of the attesting witnesses, or be acknowledged by the testator to them to have been made by him or by his authority;

"3. The testator must, at the time of subscribing or acknow-

ledging the same, declare to the attesting witnesses that the instrument is his will; and,

"4. There must be two attesting witnesses, each of whom must sign his name as a witness, at the end of the will, at the testator's request, and in his presence."

The question arises as to whether this statute was complied with in the instant case. There must be compliance with all four of these requirements for a will to be validly executed. In re Bragg's Estate, 106 Mont. 132, 76 P.2d 57. It appears that there was compliance with requirement number one in section 91-107. However, there seems to be substantial question whether there was compliance with the other three numbered requirements. In respect to requirement number two the subscribing witness, Frank May, testified that he could not remember whether the subscription of the testator was made in the presence of the subscribing witnesses or acknowledged by the testator to have been made by his authority. As to requirements number three and four of section 91-107 the testimony of this subscribing witness is very uncertain and we repeat one portion of his testimony on cross-examination as follows:

"Q. *Did he tell you that this is my last will and testament, and I am asking you to sign it as a witness?* A. *I know of one will I signed.*

"Q. *Could that be this one?* A. *No, not that one.*

"Q. *Did Bryon tell you this was his last will and testament before you signed this?* A. *I think the lawyer told me that it was his will.*" Emphasis supplied.

In this portion of his testimony it appears that the witness is actually declaring that the testator did not say that this instrument was his last will but that the lawyer did and that the testator did not request the attesting witnesses to sign the will.

We agree with the rule that the attestation clause raises a presumption of due execution of the will where the signatures are genuine. In re Bragg's Estate, supra; In re Woodburn's Estate, 128 Mont. 145, 273 P.2d 391. See also In re

Sword's Estate, 129 Mont. 165, 284 P.2d 674. We also agree that the attestation clause has evidentiary value where the witnesses are not available and that mere want of recollection of witnesses is not per se evidence of noncompliance with the statute. In re Bragg's Estate, supra. This court has held that the right to make a will depends upon the consent of the legislature and there must be strict compliance with the statute, In re Noyes' Estate, 40 Mont. 178, 105 P. 1013, but we have also declared that substantial compliance with the statute is sufficient and where, by actions or circumstances, it is shown that the will is that of the testator and that he is requesting the witnesses to sign as subscribing witnesses the exact words are not required. In re Miller's Estate, 37 Mont. 545, 97 P. 935; In re William's Estate, 50 Mont. 142, 145 P. 957; In re Silver's Estate, 98 Mont. 141, 38 P.2d 277; In re Bragg's Estate, supra.

In the instant case the proponent of the instrument has established its prima facie validity as a will by proving the existence of the attestation clause and the fact that the signatures are genuine. The burden was then shifted to the contestant of the instrument to prove that execution was not proper. In re Bragg's Estate, supra. The contestant of the instrument did not offer any witnesses of her own to testify that the execution of the will was insufficient. However, the contestant can also sustain her burden of proof by cross-examination of the witnesses of the proponent. It appears that she has done so in this case by her cross-examination of the subscribing witness, Frank May.

From all the facts and circumstances present in the instant case we conclude that the order of the district court was correct. The testimony of the subscribing witness, Frank May, was very uncertain and in some respects he testified, upon cross-examination, that the instrument was not declared to be the will of the testator, by the testator, nor did the testator request the witnesses to sign the instrument as subscribing witnesses. The other subscribing witness, Ray Kuka, was not produced by the

proponent of the will since the sheriff's return showed him to be outside of the county at the time of the hearing. However, it appeared that Mr. Kuka was on vacation at the time and would be back within the county in a short time. The district court made it quite clear that it preferred to have the testimony of Mr. Kuka offered into evidence before reaching its decision and offered to continue the case until he could be produced as a witness but the proponent chose not to have his testimony produced and objected to a continuance. At this stage the district court was justified in determining that the execution of the will had not been proven.

The proponent having failed in the lower court to prove that the proffered will was executed as required by our statutes, the judgment there entered denying its admission to probate was correct and is affirmed.

MR. CHIEF JUSTICE HARRISON, THE HONORABLE VICTOR H. FALL, District Judge, sitting for MR. JUSTICE ANGSTMAN, and THE HONORABLE EMMET GLORE, District Judge, sitting for MR. JUSTICE BOTTOMLY, concur.

MR. JUSTICE ADAIR concurring in result:

I concur in the affirmance of the judgment but not in all that is said in the majority opinion.