The question for decision is, Did the estate of Elsie King, a minor who died interestate, unmarried, and without issue, and leaving father and mother surviving her, descend to the parents equally or to the mother to the exclusion of the father?
Subdivision 3, of section 11301, Comp. Stat. 1921, reads as follows:
"Third. If there be no issue nor husband nor wife, nor father, nor mother, then in equal shares to the brothers and sisters of the decedent, and to the children of any deceased brother or sister, by right of representation; if the deceased, being a minor, leave no issue, the estate must go to the parents equally, if living together; if not living together, to the parent having had the care of said deceased minor."
The contention of the mother is that they were not living together at the time of the death of Elsie King, but had been separated and living apart about 12 years, and that she had had the exclusive care of the deceased minor during all of that time; while the contention of the father is that they were living together at the time of the death of the minor, and that the mother had not had the exclusive care and support of the minor.
The undisputed evidence is that Ella Bruner and John King were married in 1905 and had three children, the oldest of whom was Elsie King, the deceased, and whose estate is involved. In 1910 John King left his wife and three children in Muskogee county and went to Kansas. The mother secured a divorce and was granted custody of the children in 1914, and in 1920 John King married another woman in Kansas, from whom he was never divorced. He testified that in 1918 he returned to the family and lived with them about six months, during which time he cut some posts, fixed a fence, and broke about 25 acres of land, and that in April, 1921, in response to a telegram notifying him that Elsie was seriously ill, he returned on Tuesday before she died on Friday, and was living with Ella as his wife during that time of three days. On this evidence of the husband it is contended that they were living together at the time of Elsie's death. In other words, because the father had sufficient parental feeling to return to his former family and render aid and assistance in the last three days of a long lingering sickness, and on his testimony that during the three days he and his former wife were living together as husband and wife, we are asked to say that they were living together at the time of the death of the minor within the meaning of the statute. This contention is not tenable. He had been away from the family nearly 12 years. The wife had secured a divorce. He had married again and was *Page 292 
then undivorced. We think the statement of these facts renders further comment unnecessary. They were living apart and had been living apart for nearly 12 years.
The mother had the exclusive care and burden of the support of the children until 1912, when a guardian was appointed for the estate of Elsie, who had an allotment of 160 acres. After the guardian was appointed, on application of the mother, an allowance was made of $7.50 per month, which was later increased to $15 per month, and finally to $20 per month for the support and education of Elsie. The mother and children lived some seven or eight miles from Muskogee on 80 acres of land owned by the mother. It appears that Elsie was kept in school a considerable portion of the time until January, 1921, before she died in April of that year. Part of the time she was in school at Langston, part of the time in Muskogee, and for a short while in school in Kansas City. According to John King's testimony he saw Elsie five or six times between 1910, when he left the family, and until 1921, when Elsie died.
It is conceded that between 1912 and 1921 the guardian of Elsie King paid to the mother for support and education, the sum of $1,519.75. John King testified that on one occasion he sent Elsie $3, on another gave her $2, and one time sent her $10, a total of $15. He also testified that he gave her a coat and two dresses. Construing his testimony most liberally, during the 12 years he lived apart from his wife and children he gave Elsie $75. He further testified that during the three days of her last sickness he bought some medicine for her. On this testimony, which is controverted by the evidence of the mother and others, we are asked to say that the mother did not have the care of the deceased minor from 1910, when she and her family were deserted, until April, 1921, when Elsie died. We are asked to reach that conclusion on the authority of the case of Bruce v. McIntosh, 57 Okla. 774, 159 P. 261, where the court used this language:
"We think the word 'care,' as used in this section of the statute, requires that the parent in whose behalf its discriminatory and excessive benefit is asserted must be shown to have borne practically the entire burden of parental duty towards the minor, including maintenance and such other expenses as such duty requires, at the time of the minor's death and during substantially the full period of such separation of parents, to be entitled to such exclusive inheritance."
— and Alberty v. Alberty 72 Okla. 237, 180 P. 370, where it was said:
"In theory the controversy involved the construction and application of the third subdivision of section 8418, Rev. Laws 1910, but in reality it involved merely a question of fact as to who had cared for and supported the minor child."
It is not seriously contended that the gifts by John King to the minor constituted any real substantial part of her maintenance and support, but the contention is that she supported herself by the funds paid by her guardian to the mother. It is contended that because these parties were negroes, living on a farm in the circumstances disclosed by the evidence, this $1,519.75 paid by the guardian to the mother was sufficient for the support and maintenance of the minor from 1910 to 1921. To this it may be said that the evidence shows that she was kept in school away from home a considerable portion of the time and this necessarily required a greater expenditure than would have been required if she had at all times been with the family at home. The evidence shows that for about 10 months while she was attending school at Muskogee she worked for a family for her board, and during the summer months received about $3.50 per week for her services, but we think this has no part or place in considering the question as to whether the mother had the care of the deceased minor. She had the exclusive parental control and direction of the minor and responsibility for her care and keeping. It was she who was required to exercise judgment and discretion in the expenditure of the $1,519.75 for the benefit of the minor. The parental care was in no way or manner shared by the father. He shared neither the trouble, care, nor responsibility in the upbringing of the deceased minor. While, no doubt, contributions to the maintenance, support, and education of the minor may and should be considered in determining who has had the care of the minor, we do not think that financial contribution is a controlling factor. Financial contributions do not necessarily mean parental care. The evidence of John King, taken as true in all cases of conflict of the evidence, established the fact that the mother had the exclusive care of the minor from the day the father left in 1910 until her death in April, 1921, and that care was not shared in any particular by him. Our conclusion is, after considering all the evidence, that the mother and father of the deceased minor were not living together, within the meaning of the statute, at any time from 1910, when the father left the *Page 293 
family, until the death of the minor in 1921, and that the minor's estate descended to the mother to the exclusion of the father.
The judgment should be reversed, with directions to enter judgment in conformity with the views expressed in this opinion.
By the Court: It is so ordered.